IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


JAN W. CLARK,

       **Plaintiff,**

vs.                                   **CASE NO. 5:05cv108-RH/WCS**

JO ANNE B. BARNHART,
Commissioner of Social Security,

       **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Jan W. Clark, applied for supplemental security income benefits. Plaintiff was 44 years old at the time of the administrative decision, had a 12th grade education, and had no vocationally relevant past work experience.  Plaintiff alleges disability due to diabetes, high blood pressure, migraine headaches, spurs on her spine, numbness of the left hand, depression, and anxiety.  The Administrative Law Judge

found that Plaintiff has the residual functional capacity to perform a full range of light

work, and applying at step 5, the "grids," the Medical-Vocational Guidelines, 20 C.F.R. §

404.1569, and appendix 2 to subpart P, found that she is not disabled as defined by

Social Security law.  Plaintiff contends that the Administrative Law Judge improperly

discounted her testimony as to the extent of her disabilities, and failed to give

substantial weight to the opinion of her treating physician, Radwan Sabbagh, M.D.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must

affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial

deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211

(11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to

uphold the Secretary's decision by referring only to those parts of the record which

support the ALJ.  A reviewing court must view the entire record and take account of

evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber

v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Analysis**

**Plaintiff's testimony**

Plaintiff testified at the administrative hearing that she had not worked outside the home in the prior 15 years because her son has cerebral palsy, and she has had to care for him during those years.  R. 384.  Therefore, Plaintiff has no past relevant work.  Her son was 22 years old at the time of the hearing.  Id.  She said her son is now better able to care for himself and that she no longer does much for him.  Id.

Plaintiff said that she had had problems with her back for the past two years.  R. 385.  She said that her back hurts if she sits too long (about an hour) or bends over, and it hurts when she sleeps at night.  R. 385-386.  She said she could walk 30 minutes to an hour before her back started hurting.  R. 386.  She said that on an average day, the pain in her back was 7 on a scale of 10, and the pain varied from about 4 to 9.  Id. and R. 387.

Plaintiff said that when she stood for a period of time or walked, her feet would swell and become painful, and her toes would cramp.  R. 387.  She had had this condition every day for about five or six years.  *Id*.  Sitting down and elevating her feet alleviates the swelling.  R. 388.

Plaintiff also testified that she suffered pain in her neck and left arm, and numbness of the left hand.  R. 388.  She said she was told that this was caused by spurs in her neck.  *Id*.  She had had this problem for about two years, and it was getting worse.  *Id*.  She said her left hand became numb about every two days.  *Id*.  Plaintiff is left-handed.  R. 389.  Plaintiff said that when her left hand is numb, her ability to grasp an object is impaired.  *Id*.

Plaintiff also said that she experiences migraine headaches two or three times a week.  R. 390.  When a migraine occurs, she said she has to go into her darkened bedroom for "a couple of hours or until it eases off."  *Id*.

Plaintiff said that she was treated at the Life Management Center for depression and her "nerves."  R. 390-391.  Noises and driving made her anxious.  R. 391.  She had been given prescription medications, and this has helped her, though she still had problems.  *Id*.

During the day, Plaintiff said that her son helped her with washing dishes, clothes, and cleaning the bathroom.  R. 392.  She said she did a "lot of it," but her son helped, too.  *Id*.  She said she could do these chores for less than an hour and then had to sit down and take a break.  *Id*.  She did not do yard work.  *Id*.  She said that once a month she did grocery shopping with her son without problems.  R. 393.

On February 7, 2003, Plaintiff filled out a general information form.  She said there that she prepared two meals a day for herself (consisting of easily and quickly prepared foods).  R. 85.  She needed help opening cans, mixing, and watching the food cook.  *Id*.  She said she shopped for groceries, and needed help carrying bags and unloading food.  *Id*.  She said she tried to clean one room each day, but sometimes did not clean.  R. 86.  She said she did vacuuming, but rested between rooms.  *Id*.  She said she had trouble brushing and washing her hair because pain limited her ability to raise her arm, and her hand became numb so that she lost her grip.  *Id*.  She said she could not do yard work like she used to do.  *Id*.

Plaintiff also testified that she has diabetes and takes insulin by injection.  R. 393.  When her diabetes is uncontrolled, about once a month, she becomes nauseous and dizzy, and has to sit down.  R. 394.

Plaintiff has been provided medical treatment at the Washington County Health Department by Dr. Sabbagh.  R. 394.  She has been treated by Dr. Sabbagh since the mid-1990's.  R. 395.

**Medical evidence of depression and anxiety**

On March 18, 2002, Plaintiff was seen at the Life Management Center on referral by Dr. Sabbagh for anxiety, depression, and irritability.  R. 282.  She reported no social life other than transporting her mother, son, and former husband to doctors' appointments.  *Id*.  It was noted that she was markedly depressed and anxious, and repeatedly impaired in sleep and appetite.  R. 284-285.  The diagnosis was adjustment disorder, mixed, with anxiety and depression.  R. 280.

On April 22, 2002, Plaintiff was interviewed by John Hipes, Psychiatric Advanced Registered Nurse Practitioner, at the Life Management Center.  R. 276-279.  She reported she felt isolated, caring for her mother (who lived next door and had a stroke) and her son.  R. 278.  The interviewer found Plaintiff's affect to be flat and depressed, and somewhat nervous, with fleeting eye contact.  *Id.*  Her mood was depressed.  *Id.* Her thoughts, though, were well-organized, with no hallucinations.  *Id.*  Cognition was only fair.  *Id.*  The diagnosis was major depression, single episode, and generalized anxiety disorder.  *Id.*  Her assigned GAF score was 53.[1]  *Id.*  Effexor[2] was prescribed. R. 279.  She was to return in one month.  *Id.*

On May 20, 2002, Plaintiff reported to Nurse Practitioner Hipes that she was not worrying as much as she had been, and was less depressed.  R. 273.  She felt she "could tell a difference" with the medication.  *Id.*  Hipes found her to be less depressed, less nervous, and more spontaneous.  R. 273.

---

[1] "The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.'  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

> GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Manual at 34.  GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

[2] Effexor is prescribed for depression.  PHYSICIANS' DESK REFERENCE (2004), p. 3413.

On June 17, 2002, Plaintiff returned and was seen by Ken Gray, M.D., a psychiatrist, at the Life Management Center. R. 271. She said that Effexor had made her nervous, and her medication was changed to Elavil.[3] *Id.* On July 15, 2002, Hipes saw Plaintiff again, and her medication was changed to Paxil[4] because Elavil had not been helpful. R. 269. She reported she was not less depressed, and still had the anxiety side effect she had experienced with Effexor. *Id.*

On August 12, 2002, Plaintiff reported she was improved taking Paxil. R. 267. Nurse Hipes found her to be looking better, her affect was more relaxed and full range, she smiled and laughed at times, and had better eye contact. R. 267. She was found to be within normal limits. R. 268.

On September 9, 2002, Plaintiff was seen again by Nurse Hipes and said that she was "doing pretty well;" the Paxil had been "real effective." R. 265. Plaintiff felt that her depression and anxiety were "much better." *Id.* She was assigned a GAF score of 57. *Id.* All of her mental status assessment factors were within normal limits. R. 266.

On December 5, 2002, Plaintiff returned to the Life Management Center for treatment. R. 262. Nurse Practitioner Hipes said she looked more anxious and depressed, and was not as spontaneous. *Id.* Plaintiff reported that half of her days were good and half were bad. *Id.* Apparently Plaintiff was not receiving her prescription

---

[3] Elavil is an antidepressant with sedative effects. PHYSICIANS' DESK REFERENCE (2002), p. 549. Elavil is not found in the current version of the PDR.

[4] An antidepressant. Physicians' Desk Reference (2004), p. 1583.

of Effexor due to a "misunderstanding;" she had been using Paxil that had been prescribed to her family members.[5]  *Id.*  Hipes again prescribed Paxil.  *Id.*

Plaintiff had a consultative psychological examination by James E. Hord, Jr., Ph.D., on December 17, 2002,  R. 114-117.  He found her speech to be clear, understandable, and her thought processes appeared to be clear.  R. 115-116.  Her mood and affect were indicative of anxiety and depression, however.  R. 116.  Her attitude was positive and cooperative.  *Id.*  Dr. Hord thought that Plaintiff's anxiety was mild, and that she was mildly agoraphobic, "a spin off of her anxiety difficulties in my opinion."  *Id.*  He did not think that this was a "pronounced problem" for her functioning, but thought that she would be uncomfortable "in settings involving contact with others." *Id.*  He strongly recommended psychotherapy.  *Id.*

Plaintiff returned for treatment to the Life Management Center on December 31, 2002.  R. 260.  She related that she was not "doing as well as she could."  *Id.*  She said her nerves were still bad, she would get "very panicky" when out of the house, had asthma attacks, and was completely unable to drive because of anxiety.  *Id.*  It was observed by Nurse Practitioner Hipes that she was anxious, depressed, and her affect was flat.  *Id.*  He wrote that Paxil had been helpful "to a point," and he found that she had "quite a bit of disability regarding her anxiety."  *Id.*  He assigned a GAF score of 52, found that Plaintiff had moderate depression and general anxiety disorder, continued

---

[5] It is noted ahead that Plaintiff told Dr. Sabbagh that she was not receiving Paxil from the Life Management Center because they had required her to attend weekly counseling sessions that cost $10 and she could not afford that weekly fee.  R. 338.  It is uncertain what was meant by the note as to a "misunderstanding" about Effexor, particularly since that medication had been discontinued and Elavil substituted.

Paxil, and prescribed Xanax.[6]  *Id.*  He also noted that he was continuing Paxil because Plaintiff had "finally signed up for the Drug Assistance Program."  *Id.*

On January 7, 2003, a physician diagnosed Plaintiff's condition as adjustment disorder with mixed anxiety and depression.  R. 253.  He or she commented that Plaintiff reported she was "doing well" at the present time, and denied any present medication problems.  *Id.*

Plaintiff was seen again on February 10, 2003.  R. 253.  Plaintiff said she was "doing pretty well.  The medicines seemed to be working."  *Id.*  Overall, her depression and panic were better controlled with Paxil.  *Id.*  The objective assessment was that her "MSE"[7] was within normal limits.  *Id.*  She had better recall, less anxiety, and more spontaneity.  *Id.*  Nurse Practitioner Hipes reported that Plaintiff was taking Paxil and using Xanax sparingly, as indicated.  *Id.*  He concluded "She is doing well at this time with no medication changes needed."  *Id.*  He assigned a GAF score of 55.  *Id.*  All elements of Plaintiff's mental status were within normal limits.  R. 254.  It was noted, however, that her anxiety continued.  R. 241.

Plaintiff returned to the Life Management Center on March 7, 2003.  R. 251.  She said she had been using more Xanax than usual.  *Id.*  Dr. Gray said he had been concerned that she would overuse Xanax.  *Id.*  Dr. Gray increased the Paxil and discontinued Xanax.  *Id.*  Plaintiff related that she was still anxious and depressed, but Paxil was "working well," though she agreed she might need a larger dose.  *Id.*

---

[6] Xanax is prescribed for management of anxiety disorder.  PHYSICIANS' DESK REFERENCE (2004), p. 2798.

[7] Presumably MSE means mental status examination.

On April 2, 2003, Dr. Gray again reviewed Plaintiff's status and medications.  R.

249.  Plaintiff reported that Paxil had "really helped a lot."  *Id.*  She said she still had "a

little bit of anxiety."  *Id.*  Plaintiff brought a note from another physician (probably Dr.

Sabbagh) recommending that she be given Xanax, but Dr. Gray opposed this.  *Id.*  He

increased the Paxil to 50 milligrams a day (from 37.5 milligrams).  *Id.* and R. 251.  He

found her anxiety disorder to be in partial remission.  R. 249.  All elements of Plaintiff's

mental status were within normal limits.  R. 250.

On May 23, 2003, Dr. Gray reviewed Plaintiff's status and medications.  R. 247.

Plaintiff said that "Paxil has done a real good job for her depression."  *Id.*  She again

mentioned Xanax, and he prescribed Elavil instead, and in addition to Paxil.  *Id.*  All

elements of Plaintiff's mental status were within normal limits.  R. 248.

On August 20, 2003, Plaintiff was seen by Psychiatric Nurse Practitioner Nadeen

Bonica at the Life Management Center.  R. 243-245.  Plaintiff had discontinued the use

of Elavil after the first week due to over-sedation.  R. 243.  Plaintiff reported that she still

was depressed, 8 on a scale of 10.  *Id.*  She again asked for a prescription for Xanax to

help with sleep.  *Id.*  Nurse Practitioner Bonica explained that Xanax would depress the

release of serotonin and interfere with sleep, and recommended instead an increase in

the dosage of Paxil and that Trazodone[8] be added.  *Id.*  Paxil was increased to 75

milligrams daily.  *Id.*

---

[8] *Trazodone* hydrochloride, sold as Desyrel, is an antidepressant.  PHYSICIANS' DESK
REFERENCE (2002), p. 518.  It is not later editions of the PDR.

On September 17, 2003, Nurse Practitioner reported that Plaintiff had been doing well until a few days prior when her relationship of a few months with a boyfriend ended. R. 240.  Trazodone was increased and she was referred to counseling.  *Id.*

Plaintiff returned to the Life Management Center on November 29, 2003.  R. 239. Plaintiff again reported the breakup of a relationship "three days ago."  *Id.*  She had stopped taking Trazodone because it had made her sleep too deeply.  *Id.*  The amount of Trazodone was decreased.  *Id.*

On January 21, 2004, Dr. Gray noted that Plaintiff said the Trazodone was helping her sleep well, but she had cut down on Paxil from three times a day to twice a day because it caused soreness on her tongue.  R. 238.  He noted further that she was not depressed or anxious, and had no complaint.  *Id.*  His diagnosis was adjustment disorder with depressed mood, major depression, recurrent, prior history, and generalized anxiety disorder, all in remission.  *Id.*

On February 25, 2004, Dr. Gray again saw Plaintiff.  R. 236.  Plaintiff said that the medication was working very well for her.  *Id.*  She was sleeping well.  *Id.*  She was not anxious or depressed.  *Id.*  There were no side effects from the medications.  *Id.* Again, his diagnosis was the same, that her conditions were in remission.  *Id.*  Paxil and Trazodone were continued in the same amounts, and follow-up was scheduled in five weeks.  *Id.*

**Back, arm, and hand problems, and diabetes**

On December 20, 2000, Plaintiff had x-rays which revealed degenerative disc disease, arthritis, and spur formation in the lower thoracic and upper lumbar spine.  R. 307.  There was also degenerative disc disease at C4-C5 and C5-C6.  *Id.*  In the

cervical spine there was disc space narrowing, mild stenosis, and narrowing of the neural foramina. *Id.* It was also noted that a herniated disc could not be observed on an x-ray like this. *Id.*

On March 7, 2002, Radwan Sabbagh, M.D., Plaintiff's treating physician, performed a full physical examination on Plaintiff. R. 346. He noted that she had intermittent numbness in her left arm. R. 349. There was no other finding concerning her back, arm, or hand.

On April 5, 2002, Plaintiff reported she had had an "episode of confusion." R. 346. Dr. Sabbagh counseled her on keeping her blood sugar down, finding it to be 344. *Id.* She was told to go to the emergency room if her blood sugar level was high. *Id.*

On April 10, 2002, Plaintiff came in for a follow-up from an intervening visit to the emergency room. R. 345. She felt shaky, dizzy, and numb. *Id.* She had not been "eating right" and had not taken her medications. *Id.* She was given insulin at the emergency room and told to follow-up with Dr. Sabbagh. *Id.* Her blood sugar had been an average of 168, with 241 highest and 144 the lowest reading. *Id.* She was counseled on self-care for her diabetic condition. *Id.*

On July 29, 2002, Plaintiff stated that she felt calmer since she began taking Paxil as prescribed at the Life Management Center, and she thought this was helping her blood sugar and blood pressure. R. 344. She still got a headache once or twice a week. *Id.* She said she always had pain in the left shoulder and neck. *Id.* On examination, a slight tenderness was observed "with stressing the lateral cervical muscles and [left] shoulder." *Id.* There was no swelling. *Id.* It was also noted that in September, 2001, Plaintiff had had an x-ray that showed some degenerative changes at

C4-C5 and C5-C6.  *Id.*  She was supposed to get an MRI, but her Medicaid expired and this was not done.  *Id.*  It was recommended that she have an MRI notwithstanding her lack of Medicaid coverage.  *Id.*

On November 21, 2002, Plaintiff was examined on a consultative basis by Kris Lewandowski, M.D., who is board certified in internal medicine.  R. 103-105.  Plaintiff's chief complaint was that she had a headache.  R. 103.  She said she had a headache once a week, and had suffered this for four or five years.  *Id.*  He noted that "medication is working but it makes her sleepy."  *Id.*  She also said that she had had left arm pain for one year, and her whole left hand was numb.  *Id.*  She said that this pain lasts for a few hours and occurs once a week.  *Id.*  She also had had bilateral foot pain for years; it came from prolonged standing and lasted one hour.  *Id.*  Dr. Lewandowski found that plaintiff was in no visible distress, walked and sat without a problem, dressed and undressed herself with both hands, and was alert, oriented, and cooperative.  *Id.*  Her back was normal in shape, nontender to palpation, and there was no paraspinal muscle spasm.  R. 104.  Her muscles were normal in size and strength in the upper and lower extremities, without swelling, tenderness in the joints, or impairment of mobility upon active and passive movement.  *Id.*  All neurological tests were normal.  *Id.*  He observed that Plaintiff appeared to be comfortable, changed her position without difficulty, bent back 90 degrees, was able to heel and tip toe walk, had good balance, and grip and manual dexterity were normal.  *Id.*  He found no signs of complications secondary to diabetes.  *Id.*

Plaintiff came in to her physician's office on multiple occasions between August 2, 2002, and December 10, 2002, and was seen again by her physician on September

18, 2002, but she had no complaints on any of these occasions about back, shoulder, or hand pain, or about any problems arising from her diabetes.  R. 339-341.

On December 10, 2002, Plaintiff was seen by Dr. Sabbagh for a headache.  R. 338.  She said that she experienced the headache intermittently.  *Id.*  She had been taking her medication for diabetes and hypertension but had not been tracking her blood sugar because she could not afford the strips.  *Id.*  She also missed the appointment for diabetes education class.  *Id.*  She reported that the Life Management Center had stopped providing Paxil to her because she had not attended their group counseling sessions.  *Id.*  She had stopped because these were weekly sessions that cost $10 each, and she could not afford that weekly fee.  *Id.*  Upon examination it was found that her neck was supple, she had full range of motion with "subjective pain with both lateral motion."  *Id.*  There were no obvious restrictions observed, and she had full range of motion of her arms.  *Id.*  All of the neurological tests were negative.  *Id.*

On February 13, 2003, Plaintiff was seen again by Dr. Sabbagh.  R. 334.  She wanted medicine for a headache.  *Id.*  She reported that the muscle relaxant he had prescribed the last time had helped a lot.  *Id.*  He thought that she was experiencing tension headaches from possible cervical arthritis.  *Id.*  He noted that she had had problems with her blood sugar because she was having problems keeping a supply of medication.  *Id.*  She promised to "contact Project Teamcare and make arrangements for her medications before she runs out" and promised to attend the diabetes education class "this time."  *Id.*  He noted:  "She's been very reluctant to use insulin although it might be much easier to obtain through the health dept. directly than waiting for the pharmaceutical program application processing."  *Id.*  He asked Plaintiff to make a log of

her blood sugar level readings, but he acknowledged that she could not afford the strips, and it was difficult to arrange for strips through an assistance program. *Id.* A recent hemoglobin test showed her blood sugar to be uncontrolled. *Id.* He concluded: "Will hope that attending the Diabetes education class will give her motivation for better compliance." *Id.*

Plaintiff was next seen by Dr. Sabbagh on March 12, 2003. R. 333. She wanted Dr. Sabbagh to write her a prescription for Xanax. *Id.* She told Dr. Sabbagh that Dr. Gray had told her that he could not prescribe Xanax any more, and that she "has to go through her family physician." *Id.* As discussed above, on March 7, 2003, Dr. Gray had discontinued Xanax because Plaintiff had been using more and he had been concerned she might overuse it. R. 251. Plaintiff was also there for a blood sugar check. R. 333. She had attended the first diabetes education class and had become concerned because her left toe was always numb. *Id.* Upon examination Dr. Sabbagh found she had "obvious decreased sensation" of the first three left toes. *Id.* She had normal sensations on the right foot, and her gait was normal. *Id.* His diagnosis was uncontrolled diabetes with peripheral neuropathy, depression with anxiety, and tobacco abuse. *Id.* He gave her a refill of Xanax (30 tablets) but required her to get a note from Dr. Gray that she needed to be taking Xanax for the long term. R. 332. Dr. Sabbagh instructed Plaintiff on foot care, talked to her about smoking, and encouraged her to begin insulin by injection. *Id.*

On April 1, 2003, Plaintiff returned with abdominal pain and possible gall stones. R. 332. There was no pain in the lumbar muscular region. *Id.* Dr. Sabbagh referred her to a surgeon, Dr. Clemmons. *Id.* The surgery was successful.

On April 21, 2003, Plaintiff returned, asking for Xanax.  R. 331.  She asked for muscle relaxants for her neck on June 16, 2003.  R. 329.  There are a number of other notations in the record during this period for medication pickups.

On September 30, 2003, Plaintiff was seen by Dr. Sabbagh for a rash on her face and a mole on her back.  R. 325.  She reported that her blood sugar levels had been between 80 and 130, that is, her blood sugar was under control.  *Id*.

She was seen by Dr. Sabbagh again on October 13, 2003, for a cough, sore throat, and headache.  R. 324.  The diagnosis was bronchitis with asthma.  *Id*.  She was provided with an inhaler for her asthma.  *Id*.

On November 20, 2003, Plaintiff went to Dr. Sabbagh with pain on her tongue and back pain.  R. 323.  She said that she had pulled a muscle in her back that morning as she was brushing her teeth.  *Id*.  She said the pain was across her lower back and down one leg.  *Id*.  Upon examination, Dr. Sabbagh found that Plaintiff was tender in the lower lumbar muscular region, especially on the right side.  *Id*.  Straight leg raising test was positive at 65 degrees.  *Id*.  He found no radiating tingling or burning in her legs, her reflexes were normal, strength was normal, the sensory exam was normal, and she was able to walk.  *Id*.  Skelaxin[9] and Ibuprofen were provided.  *Id*.

Plaintiff came to Dr. Sabbagh's office for medications repeatedly throughout December, 2003, to May, 2004, and there was no mention of back pain or diabetes.  R.

---

[9] Skelaxin is prescribed "as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions." PHYSICIANS' DESK REFERENCE (2004), p. 2181.

318-322, 314.  She saw Dr. Sabbagh on December 29, 2003, and on February 4, 2004, but there was no mention of back pain or diabetes.  R. 322, 321.

On June 22, 2004, Dr. Sabbagh filled out a physical capacities evaluation form. R. 358-359.  He said he thought that during a normal work day, Plaintiff could lift and carry 10 pounds occasionally and could lift and carry 5 pounds frequently.  R. 358.  He said that Plaintiff could sit only 2 hours during an 8 hour work day, and stand only 1 hour.  *Id*.  He did not express an opinion as to Plaintiff's ability to push and pull with her arms and legs, climb, manipulate with her hands, bend, reach, operate motor vehicles, work around hazardous machinery, or whether she had any difficulties with allergies, dust, or other environmental problems.  *Id*.  He did not express any opinion as to the number of days Plaintiff would likely be absent from work.  *Id*.  He explained that he could not answer those questions without a full evaluation of Plaintiff's cervical and spinal problems, suggesting an MRI and nerve conduction studies.  *Id*.  Dr. Sabbagh said he thought that pain is present with Plaintiff to the extent as to be distracting to adequate performance of her daily work.  R. 359.  He thought that physical activity, such as walking, standing, sitting, bending, and the like would increase the pain, but "not to such an extent as to prevent adequate functioning in such tasks."  *Id*.  He did not think that the side effects of medication would create serious problems with Plaintiff's ability to do work.  *Id*.

### Whether the Administrative Law Judge erred in finding Plaintiff's testimony as to her disabling symptoms to be not fully credible and in discounting the opinion of the treating physician, Dr. Sabbagh

Pain and other symptoms which are reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional

capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect

either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms,
> the claimant must satisfy two parts of a three-part test showing:  (1) evidence of
> an underlying medical condition; and (2) either (a) objective medical evidence
> confirming the severity of the alleged pain; or (b) that the objectively determined
> medical condition can reasonably be expected to give rise to the claimed pain.
> *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the ALJ discredits
> subjective testimony, he must articulate explicit and adequate reasons for doing
> so.  *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to
> articulate the reasons for discrediting subjective testimony requires, as a matter
> of law, that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
> 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d at 1225.  The reasons articulated for disregarding the

claimant's subjective pain testimony must be based upon substantial evidence.  Jones

v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Likewise, the opinion of a claimant's treating physician must be accorded

substantial or considerable weight by the Commissioner unless good cause is shown to

the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  The reasons for

giving little weight to the opinion of a treating physician must be supported by

substantial evidence.  Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).  This

circuit finds good cause to afford less weight to the opinion of a treating physician "when

the: (1) treating physician's opinion is not bolstered by the evidence; (2) evidence

supported a contrary finding; or (3) treating physician's opinion was conclusory or

inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d at

1240-1241.  The ALJ must clearly articulate the reasons for rejecting the treating

physician's opinion.  *Id.*

> The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error. . . .   Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true.

MacGregor v. Bowen, 786 F.2d at 1053.

The Administrative Law Judge found Plaintiff's testimony to be not fully credible for several reasons.  He noted that she said she had numbness in her fingers and arm, but Dr. Lewandowski was of the opinion that she had 100% mobility on active and passive movement in her upper extremities.  R. 18.  He pointed out that the medical record shows that her depression and anxiety are in remission.  Id.  He noted a discrepancy between the daily activities Plaintiff described at the administrative hearing and the activities she had described earlier in conjunction with her application.  Id.  Finally, he reasoned that the objective medical evidence did not show disabilities of the severity or extent alleged in Plaintiff's testimony.  Id.

The Administrative Law Judge decided that Dr.Sabbagh's opinion as to Plaintiff's residual functional capacity was not entitled to controlling weight because it was not supported or explained by "any laboratory results or clinical findings."  R. 18.

These findings are supported by substantial evidence in the record.  The objective medical evidence does not show disabilities of the severity or extent as described in Plaintiff's testimony or sufficient to support Dr. Sabbagh's residual functional capacity opinion.  As Defendant argues in her memorandum, doc. 12, p. 4, Dr. Lewandowski found little wrong with Plaintiff.  Contrary to her testimony concerning the limited use of her left hand and arm, he observed that she could dress and undress herself with both hands, her joints in her upper extremities were not swollen or tender,

she had normal size muscles and strength in the upper and lower extremities, without swelling, tenderness in the joints, or impairment of mobility upon active and passive movement.  R. 103-104.  Plaintiff's back was normal in shape, nontender to palpation, and there was no paraspinal muscle spasm.  R. 104.  Plaintiff changed her position without difficulty, bent back 90 degrees, was able to heel and tip toe walk, had good balance, and grip and manual dexterity were normal.  *Id*.  All neurological tests were normal.  *Id*.  There were no signs of complications secondary to diabetes.  *Id*.

The x-ray results of December 20, 2000, did reveal arthritic changes in Plaintiff's spine, and this is an objectively determined medical condition.  But it cannot be said that this degenerative condition is of such severity that it "can reasonably be expected to give rise to the claimed pain."

Nor can it be said that the objective findings by Dr. Sabbagh confirm the severity of the alleged pain.  On March 7, 2002, Dr. Sabbagh noted only intermittent numbness in Plaintiff's left arm.  R. 349.  He made no other findings that day about any other disability due to arthritic degeneration of Plaintiff's cervical or lumbar spine.  On July 29, 2002, Dr. Sabbagh observed a slight tenderness "with stressing the lateral cervical muscles and [left] shoulder."  R. 344.  There was no swelling.  *Id*.  Dr. Lewandowski made his findings on November 21, 2002, and his findings are consistent with those made by Dr. Sabbagh a few months earlier.  On December 10, 2002, Dr. Sabbagh found that Plaintiff's neck was supple and she had full range of motion, but with "subjective pain with both lateral motion."  R. 338.  *Id*.  However, no obvious restrictions were observed, and she had full range of motion of her arms.  *Id*.  All of the neurological tests were negative.  *Id*.  On April 1, 2003, Dr. Sabbagh found no pain in Plaintiff's

lumbar muscular region.  R. 332.  On November 20, 2003, after Plaintiff had pulled a

muscle, Dr. Sabbagh found that Plaintiff was tender in the lower lumbar muscular

region, especially on the right side.  R. 323.  Straight leg raising test was positive at 65

degrees.  *Id.*  He found no radiating tingling or burning in her legs, her reflexes were

normal, strength and was normal, the sensory exam was normal, and she was able to

walk.  *Id.*  Dr. Sabbagh treated Plaintiff on numerous other occasions from 2002 through

early 2004, but on these occasions Plaintiff made no complaints concerning cervical,

lumbar, or left arm and hand pain, and Dr. Sabbagh made no other findings.  Thus, the

objective findings by Dr. Sabbagh are consistent with the opinion of Dr. Lewandowski

and do not confirm the severity of the pain described by Plaintiff.

The objective findings of Dr. Sabbagh are also inconsistent with his partial

residual functional capacity opinion.  Further, as argued by Defendant, Dr. Sabbagh's

residual functional capacity opinion is internally inconsistent.  Dr. Sabbagh said he

thought that pain is present with Plaintiff to the extent as to be distracting to adequate

performance of her daily work, yet he also said that he did not think that physical

activity, such as walking, standing, sitting, bending, and the like would increase the

pain, but "not to such an extent as to prevent adequate functioning in such tasks."  R.

359.

The finding that Plaintiff's depression and anxiety were in remission is likewise

supported by substantial evidence in the record.  It took some time for the appropriate

medication and dosages to be prescribed, but by August 12, 2002, Plaintiff's condition

was significantly improved with Paxil.  R. 267.  She continued to have intermittent

problems, and the medication dosages were changed, but by February 25, 2004, the

medications was working very well for her, she was sleeping well, she was not anxious or depressed, there were no side effects from the medications, and Dr. Gray's diagnosis continued to be that her conditions were in remission.  R. 236.

Finally, there is a comment in Plaintiff's memorandum that testimony from a vocational expert was necessary.  At step 5 the Commissioner may in certain cases rely upon the Medical-Vocational Guidelines, 20 C.F.R. § 404.1569, and appendix 2 to subpart P, to carry her burden of proving that there are jobs which the Plaintiff can do despite her inability to return to her past relevant work.  The "grids" may be used by the Commissioner "only when each variable on the appropriate grid accurately describes the claimant's situation."  Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).  "Exclusive reliance on the grids is not appropriate . . . when a claimant is unable to perform a full range of work at a given functional level or when a claimant has non-exertional impairments that *significantly* limit basic work skills. . . ."  826 F.2d at 1002-1003 (emphasis added).  "When considering [a claimant's] nonexertional limitations, the ALJ need only determine whether [the claimant's] nonexertional impairments *significantly* limit her basic work skills."  Phillips v. Barnhart, 357 F.3d at 1243 (citations omitted, emphasis added).  This means "limitations that prohibit a claimant from performing 'a wide range' of work at a given work level."  *Id.*

The Administrative Law Judge, however, found that Plaintiff's impairments, including her degenerative disc disease, depression, and anxiety, did not significantly limit her basic work skills, and those findings were supported by substantial evidence in the record.  Consequently, it was not error to fail to acquire evidence from a vocational expert and to rely exclusively upon the "grids" at step 5.

**Conclusion**

Thus, considering the record as a whole, the findings of the Administrative Law Judge are based upon substantial evidence in the record.  Those findings were sufficient to discount Plaintiff's pain testimony and the opinion of the treating physician, Dr. Sabbagh.  Accordingly, the decision of the Commissioner should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on November 28, 2005.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**